IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MANUEL A. GONZALES,                          )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )   No. 04 C 5626
                                             )
COOK COUNTY BUREAU OF                        )
ADMINISTRATION, PRESIDENT'S OFFICE           )
OF EMPLOYMENT TRAINING, RUDOLPH              )
SANCHEZ, and DAVID DELVELLA,                 )
                                             )
            Defendants.                      )
                                             )

## MEMORANDUM OPINION AND ORDER

This action is brought under Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000(e), 42 U.S.C. § 1983, and Illinois common
law by Manuel A. Gonzales ("Gonzales") against defendants:  his
former employer the Cook County Bureau of Administration ("Cook
County"), President's Office of Employment Training ("POET"),[1] and
his former supervisors at POET, Rudolph Sanchez ("Sanchez") and
David del Valle ("del Valle").[2]  Gonzales alleges that he was
discharged from his position with POET, ostensibly for sexually
harassing job training participants, after he complained about

---

[1]Gonzales is unclear in his pleadings whether he treats Cook
County and POET as separate entities or as one defendant, but this
court will treat the two as one defendant, Cook County, since they
both are affiliated with Cook County, Illinois.

[2]Plaintiff's amended complaint names "David Delvella" as a
defendant, but this appears to be a misspelling of del Valle's
name.  The parties do not dispute that del Valle is the intended
defendant in this matter.

internal corruption within POET and sexual harassment by his supervisor. I grant defendants' motion for summary judgment as to all plaintiff's claims.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Evidence presented in opposition to a motion for summary judgment must be admissible in content, though it need not be in an admissible form. *Payne v. Pauley*, 337 F.3d 767, 775 n.3 (7th Cir. 2003) (citing *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)). *See also Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004) (noting that affidavits submitted in opposition to summary judgment must be based on personal knowledge such that they would be admissible at trial).

II.

The parties agree on very few facts relevant to this litigation, but the following set of facts has emerged: POET is a

2

Cook County program that receives federal funding to assist unemployed people in receiving job training so that they can find new employment. POET employed Gonzales as a case manager to work with unemployed clients, particularly Spanish-speaking clients who were not fluent in English, to help them navigate POET's services. He worked with POET from 1998 until he was discharged on December 12, 2003.

Gonzales initially worked in POET's office in Cicero (the "Cicero office") for about a year, where his supervisor was Dana Sledge ("Sledge"). Gonzales testified that during that time he verbally complained to the Cicero office manager Al Silowski ("Silowski") as well as Robert Rivera ("Rivera"), who was POET's deputy director of district operations, that Sledge had made sexual advances toward him.[3] He said that Silowski had no response to his complaints, but that Rivera told him more than once to "[q]uit being a big crybaby." Gonzales also testified that although he did not receive any bad reviews from Sledge after he declined her advances, Sledge did "start writing memos regarding my incompetence in case management." Gonzales admitted that he did not know that these memos were ever acted on by his supervisors. Gonzales further testified that he also complained to the Cook County EEO

---

[3]In his deposition, Gonzales testified, "My complaint against [Sledge] is that she was asking me to go to her house for Thanksgiving, when are we going to go out and that she will make my evaluations favorable [if I went out with her]."

3

officer about the harassment, but that Cook County did not conduct an investigation.

While at the Cicero office, Gonzales also testified that he complained about "corrupt practices" that he witnessed, including POET paying money to agencies for participant training when the participants had not received any training.[4] He stated in his deposition that a co-worker, Elizabeth Waldren ("Waldren"), also witnessed such practices, and she has submitted an affidavit in this case indicating the same. Gonzales testified that two or three times, participants told him that they did not receive services for which POET had paid agencies. Gonzales went to Rivera with his complaints, but Rivera told him that "those are just rumors, speculations, and that [Rivera was] not going to go by anything like that."[5]

After about a year in the Cicero office, POET transferred him to POET's Chicago Heights location (the "Chicago Heights office"), where he remained for three months until he was transferred back to the Cicero office. Gonzales claims, without any supporting evidence, that both of these transfers were in "retaliation" for

---

[4]POET did not provide training directly to participants, but contracted that training out to third party agencies such as trade schools, etc.

[5]Gonzales has further alleged, without any supporting evidence, that immediately after he was discharged in December of 2003, he went to the Cook County Inspector General to voice his complaints about POET's practices. He alleges that in response to his complaint the Inspector General began an investigation of POET.

4

his "complaints." He also acknowledged in his deposition, though, that he was told that he was transferred back to the Cicero office "because of the overwhelming Hispanics coming in there."[6]

When he arrived at the Cicero office, Gonzales was initially placed under Sledge's supervision, but within a week was put under the supervision of a different person. Gonzales testified that he had no difficulties while at the Cicero office for this period, but also claimed that at the end of 1999 he was transferred to POET's location in Harvey (the "Harvey office") "in retaliation for his complaint against Dana Sledge [sic] his comments regarding corrupt practices." While in the Harvey office, the parties agree that Gonzales complained to his supervisor, Harvey office manager Edward Pressberry ("Pressberry"), at least once about that location's practices with respect to the Carpenter's Union School.[7]    In addition, Gonzales testified that he complained to Pressberry about his transfer to Harvey and about his increased commuting expenses. His complaints eventually made their way to Rivera, who spoke with Gonzales and "verbally over the phone stated that he's sick and tired of [Gonzales] complaining, to stop being a big crybaby and

---

[6]In his declaration attached to his response to defendants' motion for summary judgment, Gonzales alleges that he observed "similar corrupt practices" at the Harvey office but does not explain what those practices were or what he observed.

[7]Gonzales' complaint was that he was asked to sign vouchers that he did not believe were properly documented, but he admitted in his deposition that he had no first-hand knowledge that any other employee had signed vouchers improperly.

5

that when he's good and ready he'll transfer [Gonzales] again."

At the end of 2002, Gonzales claims that he was transferred to the Cicero office for two days, where Rivera told him not to unpack, and that he was subsequently sent to POET's office in Maywood (the "Maywood office").[8] del Valle was the office manager at Maywood, and Sledge also served as a supervisor at that office at this time. During his deposition Gonzales alternately stated that Sledge or del Valle was his direct supervisor while he was there.

After about a month at the Maywood office, Gonzales testified that Sledge approached him and said "that if I don't go out with her, there will be serious consequences to me being at Maywood, [and] that it was a bad decision for me to go there." According to Gonzales, he reported these comments to Debbie Constable ("Constable"), another supervisor, who instructed him to inform del Valle. Gonzales testified that after he was informed, del Valle said that he "has no concern over that, that he doesn't see anything going on in the office inappropriate with Dana Sledge and that whatever happened in the past happened in the past but it's not going to happen in [the Maywood] office." Gonzales said he also complained to del Valle about Sledge being his supervisor, but

---

[8]During all of these transfers, Gonzales' salary and position remained the same, although Gonzales contends that he should have been paid extra money for serving as an "official translator" while in Maywood.

6

del Valle responded that he did not care. The parties disagree whether Gonzales made further complaints about Sledge's behavior, but Gonzales claims that in retaliation for his complaints del Valle made him the "official" Maywood Spanish translator through an announcement to that effect to the Maywood staff. Gonzales testified that he was also given an increased workload of additional clients. Gonzales testified that he renewed his complaints about Sledge to del Valle in November of 2003, shortly before he was fired on December 11, 2003. While at Maywood, Gonzales also contends that he complained to Constable that he was being asked to sign vouchers for payment to agencies without sufficient documentation; Constable responded that she could not do anything about his complaints.

In defendants' view, Gonzales' firing was initiated because of a telephone call del Valle received from an agency that worked with POET. An employee of that agency transferred a call to del Valle from a POET client who complained that Gonzales told her he would not help her receive employment training unless she went out with him. del Valle testified that he consulted with Rivera about what to do and was told to document and forward the complaint. del Valle testified that he did so and then investigated the complaint further, in the process coming in contact with two other women who told similar stories about Gonzales. del Valle prepared a report, and testified consistent with that report, that the three women

spoke to him and gave him written statements detailing their complaints. His report reflects that each woman alleged that Gonzales pressured her to meet with him outside of the office, and made romantic or sexual advances toward each. Gonzales stated in his deposition that he did not know any of the women who purportedly brought complaints against him, and did not know that any of them were POET clients. He claims that del Valle fabricated these charges against him.[9]

del Valle testified that he completed his report and forwarded it to his superiors, and that after sending the report along he was no longer responsible for any investigation against Gonzales, since he did not have the authority to terminate POET employees. He did, however, notify Gonzales in November of 2003 that POET was holding a "Pre-Disciplinary Hearing" against Gonzales to investigate the complaints, and that as a result of the hearing Gonzales might be disciplined or fired. That hearing was held on December 2, 2003, by Robert Furniss of the Cook County Bureau of Human Resources.[10]

_____

[9]Gonzales has presented no direct evidence that this is the case. His statement of facts cites Waldren's affidavit in which she states the same, but that affidavit is conclusory and does not explain how Waldren would have knowledge that such charges were false other than the fact that she believes Gonzales "is a person of good moral character."

[10]Gonzales argues that neither the memorandum Furniss submitted in connection with his findings nor del Valle's report submitted to his supervisors are admissible evidence because both are hearsay. Defendants are correct, however, that both reports are potentially exceptions to the hearsay rule under Federal Rule of Evidence 803(8), and so I will consider their content for purposes of this

8

During the hearing, del Valle and an EEO officer, Pam Smith, testified and Furniss reviewed the written statements from the women who alleged Gonzales made advances toward them. On December 8, 2003, Furniss sent a memorandum to Sanchez indicating that as a result of the hearing he determined that the complaints were credible and that Gonzales should be discharged. Sanchez agreed and Gonzales was informed on December 12, 2003 that he was discharged.

A few months later, on May 24, 2004, Gonzales filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that POET discriminated and retaliated against him on the basis of his sex and national origin. Gonzales' charge alleged:

> On or about November 13, 2003, I complained to Respondent of employment discrimination. On or about November 17, 2003, I was placed on paid administrative leave and informed I would be subjected to a Pre-Disciplinary Hearing. On or about December 12, 2003, I was terminated. Respondent replaced me with a female.

On May 26, 2004, the EEOC issued Gonzales a right to sue letter. This litigation followed.

III.

Gonzales has brought a Title VII claim against Cook County, alleging that Cook County discharged him because of his national

---

motion to dismiss. *See, e.g.*, *Dean ex rel. Williams v. Watson*, No. 93 C 1846, 1995 WL 692020, *4–*5 (N.D. Ill. Nov. 16, 1995) (allowing report of internal investigation conducted by Chicago Housing Authority Police Department under FED. R. EVID. 803(8)).

origin and sex.[11] Even taking the facts in the light most favorable to Gonzales, he cannot establish this claim.

Gonzales opts not to argue that he has presented direct evidence of discrimination, but instead proceeds under the indirect method the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case under that method, Gonzales must show that 1) he is a member of a protected class; 2) he was performing his job satisfactorily; 3) he suffered an adverse employment action; and 4) Cook County treated similarly situated employees outside of his class more favorably. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). If he can establish this is the case, then Cook County must provide a legitimate, non-discriminatory explanation for its actions toward Gonzales. *See Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003). If Cook County can do so, then Gonzales has the burden of demonstrating that Cook County's stated reason for its actions is pretextual. *Id.*

It is undisputed that Gonzales, as a person of Puerto Rican descent, is a member of a protected class.[12] It is undisputed that

---

[11]Defendants argue that Gonzales' amended complaint does not state a claim for discrimination on the basis of national origin because Count I of that complaint only describes sex discrimination. However, elsewhere in Gonzales' complaint he clearly states that he was discriminated against because of his national origin, satisfying federal notice pleading requirements.

[12]Gonzales also contends that he is a member of a protected class because of his gender, but the Seventh Circuit has held that

10

Gonzales suffered an adverse employment action, since the action of which he complains is his discharge from POET. Finally, Gonzales is correct that he does not need to show that his performance was satisfactory since his complaint is that Cook County disciplined him more harshly than similarly situated, non-Puerto Rican employees. *See Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999) (holding that where a plaintiff alleges she was disciplined more severely than co-workers, "it makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations").

The only disputed factor with respect to Gonzales' discrimination claim is whether Cook County treated similarly situated employees outside of his class more favorably. Gonzales argues that Dana Sledge is a similarly situated female employee who is not of Puerto Rican descent and about whom complaints were made of sexual harassment, yet who was not discharged, disciplined or investigated. Gonzales has not presented evidence of any other similarly situated employees. To show that Sledge is similarly

---

a male plaintiff alleging gender discrimination "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 784 (7th Cir. 2003). *See also Gore v. Indiana Univ.*, 416 F.3d 590, 592-93 (7th Cir. 2005) (affirming that *Phelan* and other similar cases remain in force). Because I find that Gonzales cannot establish the other elements of his discrimination claim, I need not determine whether he can make such a showing here.

situated to him, Gonzales must show that she is "directly comparable to [him] in all material respects." *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "[A] court must look at all relevant factors." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Since Gonzales alleges he was disciplined more harshly than Sledge, he must show that Sledge is similarly situated "with respect to performance, qualifications, and conduct." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (citing *Radue*, 219 F.3d at 617).

Here, taking the facts in the light most favorable to Gonzales, he has presented evidence that del Valle, who was supervisor to both Sledge and him in the Maywood office, received complaints (from him) that Sledge had sexually harassed a fellow employee, and that del Valle took no action against Sledge. Sledge and Gonzales are not similarly situated with respect to their actions, however. The multiple complaints against Gonzales were from members of the public who alleged that Gonzales had conditioned their receipt of county services upon dating Gonzales. The sole complaint against Sledge came from a fellow employee who alleged that Sledge was pressuring him to date her. Gonzales has presented no admissible evidence that the allegations made about his behavior with training recipients were false, much less that del Valle fabricated such charges. He also has shown no similarly situated employee who had charges leveled against him or her from

12

recipients of county services who were disciplined less harshly than he was.

For this same reason, even if Gonzales were able to show that Sledge was similarly situated to him, he would not be able to show that Cook County's stated reason for firing him — substantiated complaints by training recipients that Gonzales had behaved inappropriate — was pretextual. Cook County has presented ample evidence of a legitimate, non-discriminatory explanation for Gonzales' discharge. See Ajayi, 336 F.3d at 531. Taking the facts in the light most favorable to Gonzales, he has not presented evidence that Cook County's stated reason was untrue. Even if Cook County did not investigate the charges against Gonzales as fully as it might have and did not allow Gonzales to question the complainants, and regardless of the veracity of the charges, there is no evidence that Cook County actually fired Gonzales for another reason. See Hague v. Thompson Distrib. Co., 436 F.3d 816, 823 (7th Cir. 2006) ("Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'") (quoting Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000)). The shortcomings that Gonzales perceives in his pre-termination hearing are not enough, by themselves, to prove that his discharge was pretextual. It is Gonzales' burden to show pretext, and here he has not met that burden. I therefore grant defendants' motion for summary

judgment as to Gonzales' claim for discrimination on the basis of national origin and gender.

IV.

Gonzales has also brought a Title VII claim against Cook County, alleging that he was discharged in retaliation for his complaints that Sledge was sexually harassing him. Like his national origin discrimination claim, Gonzales may proceed under the direct or indirect method. Gonzales argues that he can proceed under the direct method because he can establish that (1) he engaged in statutory protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (citing *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003)).[13] That causal connection can be shown by "an admission of retaliation or statements or conduct from the decisionmaker from which retaliation may be inferred." *See Radue*, 219 F.3d at 616.

Here, Gonzales contends that a connection can be inferred by the short length of time between his complaints about Sledge on November 13, 2003, and his suspension on about November 17, 2003. He also argues that retaliation can be inferred from his previous

---

[13]As discussed below, the Supreme Court recently determined that a party need not show that he suffered an adverse employment action in order to make a claim for retaliation under Title VII, but rather need only show that he suffered an action that would have been "materially adverse to a reasonable employee." *See Burlington N. & Santa Fe Ry. Co. v. White*, – U.S. –, 2006 WL 1698953, *10 (June 22, 2006) (internal citations omitted).

14

complaints about Sledge's harassment, his subsequent transfers and increased workload which resulted from those complaints, and from the fact that del Valle, the hearing officer, and Sanchez knew about Gonzales' complaints against Sledge. However, even taking the facts in the light most favorable to Gonzales, retaliation cannot be inferred from this conduct alone. Defendants presented evidence that del Valle received a telephone call on November 3, 2003, ten days before Gonzales renewed his complaints about Sledge, that a training recipient had a complaint about Gonzales. He investigated that complaint and submitted a report to the EEO officer and his supervisor, setting the events in motion that defendants contend led to Gonzales' firing. Even if Gonzales' suspension, pre-termination hearing, and discharge all came after his complaint, and even if all POET employees involved in those events were aware he had made complaints about sexual harassment, the process for his suspension and discharge were already in motion, and Gonzales presented no evidence from which a reasonable finder of fact could conclude otherwise.

Likewise, the previous transfers and Gonzales' workload, as well as his previous complaints, do not provide any evidence to refute the true reason for Gonzales' firing. Gonzales acknowledges that the previous transfers were at the behest of Rivera, who told him not to be a "crybaby" when Gonzales complained to him about Sledge's behavior. However, Rivera is not a party to this action

15

and does not appear to have played a role in Gonzales' discharge, so his previous actions do not provide any evidence that Gonzales' discharge or investigation was retaliatory. In addition, the fact that del Valle did not take action in response to Gonzales' earlier complaints is not enough from which a finder of fact could conclude that del Valle initiated a complaint against Gonzales in order to retaliate against him for his earlier complaints.

Because Gonzales cannot proceed under the direct method, he must proceed under the indirect method. He therefore must show that (1) he was engaged in statutorily protected activity; (2) he was performing his job according to defendants' legitimate expectations; (3) despite that performance, he suffered a materially adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1031 (7th Cir. 2004)); *Burlington N. & Santa Fe Ry. Co. v. White*, – U.S. –, 2006 WL 1698953, *10 (June 22, 2006) (internal citations omitted).[14]

---

[14]In this recent decision the Supreme Court determined that a party need not show that he suffered an adverse employment action, as previous cases required, but instead may show that his employer's action "would have been materially adverse to a reasonable employee" such that it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 2006 WL 1698953 at *10.

16

Gonzales can show that he was engaged in a statutorily protected activity by complaining about sexual harassment to his supervisor. He can also show that he suffered a materially adverse action, namely his discharge. Even assuming that he met defendants' legitimate expectations (which may not be required here for the reasons discussed with relation to his discrimination claim), he has simply presented no evidence that he was treated less favorably than employees who did not complain about sexual harassment. Sledge is the only employee to whom he claims he is similarly situated, and for the same reasons discussed with respect to his discrimination claim, he is not truly similarly situated to her. Also, for the reasons discussed above, even assuming that he has made out a *prima facie* case for retaliation, he has presented no evidence from which a finder of fact could conclude that he was fired for any reason other than the complaints training recipients made against him. Therefore, I grant summary judgment to defendants as to his retaliation claim as well.

V.

Gonzales has brought an equal protection claim under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution against all defendants, alleging that defendants denied him equal protection on the basis of his gender by (1) not being protected from sexual harassment and not having his complaints of sexual harassment addressed; (2) being subject to an

17

"unwarranted" pre-disciplinary hearing; and (3) being retaliated against for complaining about harassment and discrimination. Defendants have moved for summary judgment as to this claim as to defendant del Valle only.

To establish a *prima facie* case of discrimination under the Equal Protection Clause, Gonzales must show that (1) he is a member of a protected class; (2) he is otherwise similarly situated to members of the unprotected class; (3) he was treated differently from members of the unprotected class with whom he is similarly situated; and (4) that the defendants acted with discriminatory intent. *See, e.g., Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 944-45 (7th Cir. 1996). For the reasons that summary judgment is appropriate as to plaintiff's discrimination and retaliation claims, summary judgment is also appropriate as to del Valle on this claim as well. Even taking the facts in the light most favorable to Gonzales, there is no evidence that Gonzales was treated differently than any similarly situated female employee who made complaints of sexual harassment or had complaints made against her from training recipients. Sledge is not similarly situated to Gonzales for this purpose. Therefore, I grant summary judgment for all defendants on this claim.[15]

---

[15]Although defendants have only specifically moved for dismissal as to del Valle on this claim, the lack of a dispute of material fact as to whether a similarly situated employee was treated differently dooms Gonzales' claims against the other defendants. Defendants' motion addresses this issue with respect

Gonzales has brought an equal protection claim under § 1983 and the First Amendment of the United States Constitution against all defendants, alleging that defendants denied him his rights under the First Amendment by transferring him and ultimately discharging him for complaining about "corrupt practices" within POET. In order to establish a § 1983 claim for violation of his right to free speech, Gonzales must show (1) his speech was constitutionally protected and (2) that speech was a substantial or motivating factor in his transfer and discharge. *See Spiegla v. Hull*, 371 F.3d 928, 934 (7th Cir. 2004). If Gonzales can make that showing, then Cook County must show that it would have taken the same action in the absence of Gonzales' speech. *Id.*

Here, Gonzales argues that he was engaged in protected speech when he complained that he was being asked to sign vouchers that did not have proper documentation. Cook County contends that this is not a matter of public concern but rather a complaint about "internal office affairs" that does not rise to the level of a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 149

to del Valle but the inquiry is the same for other defendants as well. Because Gonzales had notice that this element of the test for an equal protection claim was at issue, it is not inappropriate for the court to grant summary judgment sua sponte as to the other defendants. *See Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir. 2006) (affirming grant of summary judgment where, although court raised certain arguments supporting summary judgment sua sponte, defendant was on notice that he needed to establish at least a dispute of material facts relating to his claims).

(1983). There is evidence that Gonzales' complaints related to his concern that he was being asked to sign vouchers for services that he believed had not been provided, which would be a matter of public concern. However, Gonzales faces more difficulty in showing that his complaints about signing vouchers were a "substantial or motivating factor" in his transfers or his discharge. In support of his argument that his discharge was at least partially retaliatory, Gonzales relies on the allegations in his complaint, and the conclusory affidavit of Waldren in which she states, without any basis for her knowledge or opinion, that Gonzales' discharge was retaliatory. Neither his complaint nor Waldren's conclusory opinion are admissible evidence to support Gonzales' claim. As discussed with respect to Gonzales' other claims, defendants have presented evidence that Gonzales was fired because of complaints from training recipients about his behavior, and that regardless of Gonzales' complaints he would have been discharged for that reason. Gonzales has presented no admissible evidence from which a trier of fact could infer that absent his complaints Gonzales would not have been discharged. Likewise, Gonzales has no evidence from which to infer that del Valle facilitated, approved, condoned, or turned a blind eye to any retaliation against Gonzales. *See, e.g., Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). He alleges without support that del Valle gave

false testimony at his pre-termination hearing but has no evidence that this testimony was false.

The issue of Gonzales' transfers is more difficult. Gonzales testified that each time he complained about corrupt practices, he was transferred within a short time (from Cicero to Chicago Heights, then from Chicago Heights back to Cicero for a few days, followed by a transfer to Harvey). A finder of fact could conclude that these transfers were due at least in part to Gonzales' complaints. However, Gonzales claims that each time he was transferred, that decision was made by Rivera, who is not a party to this case. Even assuming that these transfers are actionable as retaliation, there is no evidence connecting del Valle or Sanchez to those transfers, so Gonzales has no claim against those individuals. At most, he would have a claim against Cook County if he can show that these transfers were part of an express policy, were a widespread practice, or were caused by a person with "final policymaking authority" for Cook County. *See, e.g., McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal citation omitted). *See also Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978) (holding that municipalities cannot be held liable on a theory of *respondeat superior*).

Gonzales asserts that, in addition to his amended complaint, his discharge "is evidence that [Cook County] maintained a policy

21

of suppressing free speech," and "[t]he fact that Cook County upper management filed false allegation [sic] against Gonzales is evidence that Cook County maintained a policy of suppressing free speech against matters of public concern." These allegations are not enough to show *Monell* liability for Cook County. Gonzales has presented no admissible evidence, other than the inference from the fact that he himself was transferred, that Cook County has an express policy or widespread practice of transferring employees who complain about corruption. He has also presented neither evidence nor argument that Rivera has final policymaking authority for Cook County. Because, even taking the facts in the light most favorable to Gonzales, he cannot make out a claim for a § 1983 violation under this theory, I grant summary judgment to defendants on this claim.

### VII.

Gonzales' final claim is for retaliatory discharge under Illinois law. He alleges that he was discharged because he complained of corrupt practices within POET. Under Illinois law, Gonzales must show that 1) he was discharged in retaliation for his activities; and (2) the discharge is in contravention of a clearly mandated public policy, such as protection of whistle-blowers, as Gonzales' claims he is here. *See Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376, 235 Ill. Dec. 936, 938, 706 N.E.2d 491, 493 (1998). Whistle-blowing in this context means "reporting of

22

illegal or improper conduct." *Id.* Defendants contend that Illinois public policy only protects those who report wrongdoing to outside agencies, rather than those who complain internally as Gonzales did. However, the Seventh Circuit and at least one Illinois court have determined that retaliatory discharge for internal whistle-blowing is actionable. *See, e.g., Mackie v. Vaughan Chapter-Paralyzed Veterans of America, Inc.*, 354 Ill. App. 3d 731, 289 Ill. Dec. 967, 820 N.E.2d 1042 (Ill. App. Ct. 2004) (reversing circuit court's dismissal of retaliatory discharge action where employees of veterans' group chapter complained to chapter and group's police department that another employee was misusing chapter's mailing list). *See also Belline v. K-Mart Corp.*, 940 F.2d 184 (7th Cir. 1991) (reversing district court's dismissal of retaliatory discharge claim where store employee complained to management that his supervisor had asked him to give a customer merchandise without payment). Gonzales' claim is similar to the facts of these cases; he alleged that he was discharged after he complained to management that he was asked to sign vouchers to pay agencies for training that they had not provided.

The problem with Gonzales' claim lies in the first prong of the retaliatory discharge test, that he was discharged in retaliation for his whistle-blowing activities. As discussed above, Gonzales has no admissible evidence that this was the reason

23

for his discharge. Accordingly, I grant summary judgment to defendants on this claim as well.

## VIII.

Because, even taking the facts in the light most favorable to Gonzales, he cannot establish any of his claims, I grant summary judgment as to defendants on all claims.

**ENTER ORDER:**

_Elaine E Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: July 18, 2006